**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TIMOTHY J. DENNY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | )   CASE NO. 06-CV-620-FHM |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the | ) |
| Social Security Administration,[1] | ) |
| | ) |
| DEFENDANT. | ) |

**ORDER**

Plaintiff, Timothy J. Denny, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[2] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less

---

[1] On February 1, 2007, Michael J. Astrue was confirmed as Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Jo Anne B. Barnhart the former Commissioner, as defendant in this case. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff's September 16, 2004 (protective filing date: August 9, 2004) application for disability insurance benefits was denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held March 14, 2006. By decision dated May 19, 2006, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on October 16, 2006. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir. 2003). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was born March 28, 1960, and was 45 years old at the time of the hearing. [R. 47, 589]. He claims to have been unable to work since January 20, 2003, due to pain and swelling of the right leg and knee and skin sensitivity in the left lower extremities as the result of injuries sustained in an accident. [R. 592, 600]. The ALJ determined that Plaintiff has severe impairments consisting of degenerative joint disease of the right knee and burn residuals of the right lower extremity (sic). [R. 15]. Despite these impairments, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to perform a wide range of sedentary work. [R.16-17]. He determined that Plaintiff's RFC precluded returning to his past relevant work (PRW). [R. 17-18]. Based upon the testimony of a Vocational Expert (VE), the ALJ found there are semi-skilled sedentary jobs available in significant numbers in the economy that Plaintiff can perform. [R. 18]. He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 19]. The case was thus decided at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts three allegations of error: 1) that the ALJ failed to perform a proper determination at step five with regard to the VE's testimony; 2) that the ALJ failed to properly evaluate the opinion of Plaintiff's treating physician; and 3) that the ALJ failed to perform a proper credibility determination. For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

## **Medical Evidence**

On January 20, 2003, Plaintiff was injured when the tanker-truck he was driving rolled and exploded. [R. 83-133]. He suffered fractures of the left radius and ulna (forearm), right tibia and fibula (lower leg), right chylous (intestinal lymph vessels), right calcaneus (heel) with possible Achilles tendon disruption; minor burn to the right ear; and second and third degree burns of the left lower extremity (thigh). [R. 83; 88]. While he was hospitalized, Plaintiff underwent orthopedic surgeries to repair his fractures followed by skin graft procedures and plastic surgery for his burns. [R. 95-100]. He was discharged from the hospital on February 17, 2003, in stable condition with weightbearing restrictions. [R. 88-89].

Plaintiff received monthly follow-up treatment from Christopher A. Browne, M.D., his orthopedic surgeon. [R. 204-223]. Dr. Browne referred him for thrice-weekly physical therapy sessions commencing on March 10, 2003. [R. 527-533].

On May 21, 2003, Plaintiff complained to a physician's assistant of depression. [R. 135-140]. He was noted to be on crutches and easily tearful. He was prescribed Zoloft and Xanax and referred to the psychiatry intake center and told to discuss pain

control with Dr. Brown (sic). *Id.* There is no indication in the record that Plaintiff followed up on that referral.

Physical therapy treatment continued through September 18, 2003, during which time Plaintiff was noted to be using two crutches with very little weight-bearing. [R. 337-526]. On September 23, 2003, Dr. Browne assessed delayed union of the right tibial shaft fracture and planned another surgery consisting of insertion of a tibial rod followed by use of a bone stimulator. [R. 204, 205]. Two weeks after that surgery, Dr. Browne reported the discomfort Plaintiff had in the proximal tibia "is actually gone." [R. 203]. Plaintiff was advised to wear the bone stimulator and return for repeat x-rays and re-examination in six weeks. [R. 203].

On January 6, 2004, Dr. Browne noted the fracture site appeared to be healing but Plaintiff complained of pain in the knee area. [R. 201-202]. The doctor decided to "hold off" prescribing anti-inflammatories because "this could hamper his fracture union." *Id.* At the next follow-up examination by Dr. Browne, Plaintiff exhibited healing tibia fracture but also had evidence of arthritic changes in the tibia fibular joint (knee). [R. 199-200]. Physical therapy was re-started on January 22, 2004, and use of a single crutch was noted. [R. 335-336]. During an examination on March 2, 2004, Dr. Browne reported Plaintiff's significant discomfort in the knee was not getting better with physical therapy. [R. 197-198]. He ordered an MRI. [R. 197]. After review of the MRI on March 9, 2004, Dr. Browne referred Plaintiff to one of his partners for evaluation of the ACL. [R. 194-195].

Bradford L. Boone, M.D., examined Plaintiff on March 25, 2004. [R. 192-193]. He reported Plaintiff had progressed off crutches and was currently using a cane. *Id.*

4

He found a normal ACL but assessed patellofemoral compression syndrome.[3] He recommended continued physical therapy and "simply giving this more time." [R. 193]. He suggested a knee arthroscopy, patella chondroplasty and lateral release if Plaintiff's symptoms did not improve. *Id.* He thought it "reasonable to assume that [Plaintiff] will be able to get back to his truck driving duties from a knee perspective at some point in time." *Id.*

On April 4, 2004, Paul A. Howard, M.D., Plaintiff's plastic and reconstructive surgeon, wrote a letter to Plaintiff's insurance carrier reporting on Plaintiff's three surgeries to repair his burned thigh areas, his symptoms of itching, breakdown and pain and the need to limit his exposure to any kind of caustic chemicals. [R. 142]. He rated Plaintiff's impairment due to his skin condition at 10% pursuant to the workers' compensation tables.

Dr. Browne examined Plaintiff on April 21, 2004, noting "little change from previous" with more localized tenderness in the pararetinacular tissues and crepitus (crackling sound) behind the patella. [R. 190-191]. He prescribed anti-inflammatories and continued physical therapy. *Id.* On May 19, 2004, Dr. Browne reported Plaintiff had not responded to conservative treatment measures and arranged for the arthroscopy. [R. 189]. That surgery was performed on June 10, 2004. [R. 162-168. 186-189]. On June 22, 2004, Dr. Browne reported some of the pain and popping sensation was improved and he planned to send Plaintiff back to physical therapy. [R. 185]. He wrote:

---

[3] Also known as chondromalacia, softening of the articular cartilage, irritation of the undersurface of the kneecap resulting from misalignment of the kneecap as it slides over the lower end of the thigh bone. *Dorlands' Ill. Med. Dict.* 28th ed. 321 (1994); Information online at: http:/orthopedics.about.com/cs/patelladisorders/a/chondromalacia.htm.

5

"In regards to his overall status, the best benefit he could have would be to obtain more of a sedentary job as he has early degenerative changes. In addition, he would receive a great benefit from the weight loss. I will see him back in four weeks' time." *Id.*

On July 23, 2004, Dr. Browne noted improvement of strength, but pain with ambulation and some crepitus behind the patella. [R. 182]. After discussion with Plaintiff he gave him the first of three Synvisc injections and wrote:

> I am unsure of how much relief he will get from this. Certainly at some point down the road he will likely need a knee replacement. Given his large size, this really needs to be a last resort and he should wait as long as he possibly can. I did discuss with him that the most important thing would be weight loss and that he should get involved with a primary physician and focus on that especially and in regards to exercise focus on nonweightbearing activities, biking and especially pool therapy.

*Id.* After the third injection, Dr. Browne prescribed Lortab (a narcotic pain reliever). [R. 180-181]. Plaintiff was sent to the physical therapist for a functional capacity evaluation on August 17, 2004. [R. 170-179]. He was found to be able: to lift 40 lbs. occasionally,[4] 25 lbs. frequently; to carry 20 lbs. occasionally, 15 lbs. frequently; to constantly sit; to perform repetitive reaching, handling and fingering; to occasionally push, pull, walk, climb stairs, and perform repetitive 1/4 squats; to frequently stand, stoop and reach overhead; but rarely able to balance. He was unable to kneel, crouch and crawl. *Id.* He was also unable to perform full repetitive squatting activities. He was not tested for foot controls or climbing ladders. [R. 176]. Based upon this evaluation, Dr. Browne opined

---

[4] (60 lbs. "knuckle to shoulder").

on September 14, 2004, that overall, Plaintiff could perform medium work exhibiting 20 to 50 pounds of force occasionally and 10 to 25 pounds frequently. [R. 169]. He said:

> This would, of course, allow him to drive his truck and occasionally lift but not the true lifting capacity as needed by heavy truck labor. As I discussed with him in the past, the most beneficial thing for him would be to lose some weight. In addition to that he should obtain a more sedentary job if possible. At this point, I do not feel there is much else we can provide him as far as orthopaedic treatment at the time and will go ahead and release him.

*Id.* He referred Plaintiff back to his primary physician but noted that he would continue refilling Plaintiff's pain medications if needed. *Id.* On October 13, 2004, Plaintiff was discharged from physical therapy with instructions to continue home exercises. [R. 224-225].

On October 12, 2004, Plaintiff commenced treatment with Gene Evans, M.D. [R. 541-545]. Dr. Evans assessed chronic pain, post traumatic arthritis in the right knee and ankle and prescribed Lortab. [R. 544]. He noted Dr. Browne's previous report that Plaintiff "may perform medium duty work." [R. 545].

An RFC form filled out by a non-examining medical consultant on November 4, 2004, assessed Plaintiff's exertional limitations as: occasionally lifting and/or carrying 10 pounds; frequently lifting and/or carrying less than 10 pounds; standing and/or walking at least 2 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday and unlimited pushing and/or pulling of hand and/or foot controls. [R. 547A]. The consultant also assessed postural limitations of occasional climbing, balancing,

stooping, kneeling, crouching and crawling. [R. 548]. He found no manipulative, visual, communicative or environmental limitations. [R. 549].[5]

Treatment records from November 9, 2004, and December 6, 2004, indicate Dr. Evans re-filled Plaintiff's Lortab prescription and reported Plaintiff's pain was adequately controlled. [R. 539, 540]. He diagnosed posterior traumatic arthritis. Dr. Evans continued to see Plaintiff on a monthly basis from January 2005 through August 2005. [R. 538, 556-562]. His records during that time reflect consistent complaints of chronic right knee pain and pitting edema (prolonged swelling). *Id.*

A letter dated March 3, 2004, from Dr. Browne appears in the record. [R. 196]. The date is apparently scrivener's error, as the dictation and transcription dates are March 22, 2005 and March 23, 2005, respectively. *Id.* Additionally, in the letter, Dr. Browne reported on Plaintiff's surgical history, including the arthroscopic surgery performed on June 10, 2004, and his release of Plaintiff from treatment in September 2004. He also mentioned the functional capacity exam which revealed that Plaintiff "really could not bear significant weight or perform lifting activities involving the lower extremity." He said:

> While he can still operate a motor vehicle, it does not appear that he can perform the true activities of an employed truck driver. Recent physical exam by the Department of Transportation confirms this. As such, he would require a more sedentary job.

[R. 196]. The Department of Transportation examination referred to by Dr. Browne is dated February 12, 2005. [R. 554-555]. The examiner observed that Plaintiff was

---

[5] A reviewing medical expert affirmed the RFC findings on February 2, 2005. [R. 552].

obese and exhibited prominent edema in the right leg, decreased range of motion and weakness in the knee and ankle, surgical scars and pronounced limp. He was determined to be unfit for a commercial driver's license. *Id.*

On August 22, 2005, Dr. Evans reported Plaintiff had been weaned down to half the dosage of Lortab and noted no edema. [R. 558]. Dr. Evans saw Plaintiff again on September 19, 2005. [R. 582-583]. Pitting edema was recorded and prescriptions for pain medications as well as Lasix (a diuretic) and potassium were refilled. [R. 583]. A follow-up appointment on October 31, 2005, focused primarily on Plaintiff's diabetes and hypertension. [R. 580-581]. On December 1, 2005, Plaintiff saw Dr. Evans for abdominal pain. [R. 578-579]. No abdominal pain complaints were registered on December 19, 2005; Plaintiff's right leg pain was reported to be unchanged. [R. 576-577]. On January 16, 2006, Plaintiff again complained of abdominal pain. [R. 574-575]. Plaintiff's primary complaint on January 23, 2006, was pain in his right knee and lower leg. [R. 572-573]. Pretibial edema to the mid calf and a slightly antalgic gait was observed. Full range of motion with significant crepitance was noted. Posterior traumatic arthritis was diagnosed. *Id.* Dr. Evans' examination notes were virtually the same on February 20, 2006. [R. 570].

On March 10, 2006, Dr. Evans filled out and signed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form. [R. 566-568]. He assessed exertional limitations as follows:

> Occasionally lifting and/or carrying up to 20 pounds;
> Frequently lifting and/or carrying less than 10 pounds;
> Standing and/or walking less than 2 hours in an 8-hour workday;
> Sitting about 6 hours in an 8-hour workday;
> Limited in pushing and/or pulling in lower extremities.

[R. 566-567]. The medical/clinical finding supporting these conclusions was "Traumatic arthritis - fairly severe." Under postural limitations, the doctor checked:

> Never climbing - ramps/stairs/ladder/rope/scaffold;
> Occasional balancing;
> Never kneeling, crouching and crawling.

[R. 567]. He found unlimited manipulative functions, visual/communicative and environmental faculties. [R. 568].

### The ALJ's Decision

The ALJ found Plaintiff has severe impairments of degenerative joint disease of the right knee and burn residuals of the right lower extremity (sic).[6] [R. 15]. The ALJ noted Dr. Evans' RFC assessment but concluded it was somewhat conservative and too restrictive in light of Dr. Browne's release to medium work. [R. 16]. He assigned Plaintiff a wide range of sedentary level of exertional tasks and wrote:

> Specifically, the claimant is able to lift and carry up to 10 pounds. He is able to sit up to 6 hours in an 8 hour work day, and stand or walk up to 2 hours in an 8 hour work day. The claimant is able to perform tasks where there is no requirement for stooping, crouching, crawling, or kneeling. He is able to perform tasks where there is no requirement for climbing stairs or ladders, and where there is no requirement for repetitive use of his lower extremities for foot pedals or controls. The claimant has moderate chronic pain, but is able to remain attentive and carry out work tasks. He takes pain medications, but is alert. The claimant requires the ability to change position from time to time.

---

[6] Later in his decision, the ALJ mentioned Plaintiff's testimony regarding continuing problems with his "left" leg burn injury. [R. 17].

[R. 16-17]. He found Plaintiff's testimony concerning the intensity, duration and limiting effects of his symptoms was not entirely credibile. [R. 17]. He determined Plaintiff's RFC would preclude Plaintiff from returning to his past relevant work (PRW). [R. 18]. He stated the transferability of job skills is not material to the determination of disability due to Plaintiff's age but noted the VE testified that Plaintiff has transferable skills "including customer service, basic record-keeping, and cashiering." [R. 18]. He found Plaintiff would be able to perform the requirements of representative occupations such as a maintenance scheduler (semi-skilled/sedentary) and check cashier (semi-skilled/sedentary) and that, because such jobs exist in significant numbers in the economy, Plaintiff is not disabled. [R. 18-19].

## **Discussion**

Plaintiff complains the ALJ failed to perform a proper determination at step five by ignoring that the VE's testimony was not in conformity with case law and by finding that the VE's testimony was supported by the DOT when there is no indication that it was.[7] Plaintiff asserts the ALJ did not properly evaluate the treating physician's opinion by failing to perform a proper analysis and failing to give specific and legitimate reasons for rejecting the opinion of the treating physician. Plaintiff also faults the ALJ's credibility determination. For purposes of expediency, the Court first addresses Plaintiff's allegation of error regarding the ALJ's evaluation of the treating physician's opinion.

---

[7] Employment and Training Administration, U.S. Dept. of Labor, Dictionary of Occupational Titles (Fourth Edition, Revised 1991) and its companion publication, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993).

Generally, a treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, what the claimant can still do despite impairment(s) and any physical and mental restrictions. See 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The Commissioner will give controlling weight to that type of opinion if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Plaintiff contends the ALJ improperly failed to accord controlling weight to the opinion of Dr. Evans regarding Plaintiff's limitations. Defendant responds that Dr. Evans' opinion was inconsistent with the opinion of Dr. Browne who, as Plaintiff's orthopedic surgeon, was also Plaintiff's treating physician and that the ALJ was entitled to reject Dr. Evans' opinion on the basis of such contrary medical evidence. It is true that it is the ALJ's province, as fact finder, to decide the appropriate weight to be given contradictory medical evidence. *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir.1987) (fact finder has responsibility to resolve genuine conflicts between opinion of treating physician and other contrary evidence).[8] In doing so, however, the ALJ must provide legally sufficient reasons for the weight he accorded the treating physicians' opinions. *See Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir. 1988) (ALJ must explain how he

---

[8] The ALJ must weigh the opinion of a treating physician in accordance with factors provided in 20 C.F.R. §§404.1527 and 416.927, which are:(1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart,* 350 F.3d 1297, 1301 (10th Cir.2003).

weighed treating physicians' opinions that differed not in the impairments themselves but merely in assessments of the severity of limitations imposed by the impairments).

In this case, when the ALJ determined Plaintiff's RFC, he essentially adopted Dr. Evans' assessed limitations except the standing and walking restrictions. Instead of explaining how he determined Dr. Evans' opinion in this functional category was not entitled to controlling weight, he merely cited Dr. Browne's September 2004 statement that Plaintiff was capable of medium work as grounds for rejecting Dr. Evans' opinion. The ALJ did not find Plaintiff was capable of performing medium work, however. He determined Plaintiff was limited to sedentary work activities with restrictions against stooping, crouching, crawling, kneeling, climbing, repetitive use of the lower extremities and requiring the ability to change position from time to time.[9] Yet, the ALJ did not accept Dr. Evans' opinion that Plaintiff could stand and/or walk less than 2 hours in an 8-hour workday. [R. 566]. The ALJ did not explain why he rejected Dr. Evans' opinion about Plaintiff's standing and/or walking limitations while apparently accepting his opinion about Plaintiff's postural limitations and inability to use foot controls. This is particularly crucial in this case because, with the standing and walking limitations imposed by Dr. Evans, Plaintiff's RFC would allow less than the occasional walking and standing required in sedentary work. 20 C.F.R. § 404.1567(a); Social Security Ruling

---

[9] The RFC comports with the RFC form filled out by the agency's non-examining medical consultant on November 4, 2004, in all but the postural limitations (the consultant checked "occasionally" in those activities), in the restrictions against using foot controls (the consultant checked "unlimited") and in the need to change position from time to time (no such limitation indicated by the consultant). [R. 16-17, 547A-552]. For those activities, the ALJ appears to have adopted Dr. Evans' assessment.

(SSR) 96-9p, 1996 WL 374185, at *3 ("occasionally" means very little to one-third of the time or up to two hours of an 8-hour work day).[10]

The ALJ rejected Dr. Evans' opinion on the basis that it conflicted with Dr. Browne's opinion but failed to adopt Dr. Browne's opinion in his RFC determination. The ALJ accepted portions of the agency physician's RFC assessment and portions of Dr. Evans' opinion without sufficient explanation of his reasons for doing so.  This is error.  *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir.2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").  At a minimum, the ALJ would have to explain his reason(s) for rejecting part of a report. *See Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir.1984)(holding that if the ALJ and Appeals Council had reason to reject certain reports, "those reasons should have been stated.").

Furthermore, it is not clear that Dr. Browne actually believed Plaintiff was capable of performing work activities on the medium level as defined by 20 C.F.R. § 404.1567(c); SSR 83-10, 1983 WL 31251 (S.S.A.).[11]  The record indicates that Dr.

---

[10] The hypothetical given to the VE by the ALJ provided for "walking, no more than two hours in an eight-hour day." [R. 610].  There is no information in the record describing the actual walking required in any of the jobs identified by the VE or if any of the jobs entailed walking less than two hours.

[11] The regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. ...

The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck
(continued...)

Browne consulted with Plaintiff's physical therapists and the functional capacity examination conducted by them was at his behest.  Dr. Browne cited the results of that examination when he wrote his report on September 14, 2004. [R. 169].  However, In the same report where he acknowledged that the evaluation "suggests medium work exhibiting 20 to 50 pounds of force occasionally and 10 to 25 pounds frequently," Dr. Browne opined that Plaintiff should obtain a more sedentary job. [R. 169].  That sentiment was repeated in stronger terms in his March 2005 letter. [R. 196].  Dr. Browne's March 2005 letter appears to contradict his September 2004 report.  The ALJ's written decision contains no mention of Dr. Browne's March 2005 letter; perhaps because it was dated incorrectly.  Because the ALJ did not address Dr. Browne's most recent medical opinion,  it is unclear whether he considered or rejected this evidence. *See Green v. Barnhart*, 67 Fed.Appx.518, 2003 WL 21300344 (10th Cir. 2003) (unpublished) (holding ALJ's failure to consider most recent medical evidence from claimant's treating physician in RFC determination is basis for reversal) (citing *Goatcher v. United States Dep't of Health & Human Servs.,* 52 F.3d 288, 289-90 (10th Cir. 1995) (holding ALJ's failure to provide specific reasons for rejecting assessments of treating physician is reversible error).  Upon remand, the ALJ must evaluate this evidence and explain in his decision what weight it was accorded and how it impacted the weight he assigned Dr. Evans' opinion as well as his determination with regard to Plaintiff's RFC.

---

[11] (...continued)
driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

Because the ALJ did not adequately explain the weight he accorded all the medical evidence or how he resolved inconsistencies between the medical findings in evaluating Plaintiff's RFC and because there is probative medical evidence in the record that the ALJ did not consider, this case must be remanded to the Commissioner for reconsideration on that basis.

### **Transferable Skills**

Plaintiff asserts the ALJ's step five determination did not conform with case law with regard to the transferable skills Plaintiff possessed. Specifically, Plaintiff contends the VE did not identify "which skills were acquired on which job, and which job gave him those transferable skills." [Plaintiff's brief, p. 2]. Defendant responds that the VE's testimony that "the transferable skills were in customer services, some basic record keeping, and cashiering" was adequate to satisfy the requirements of *Dikeman v. Halter*, 245 F.3d 1182, 1195 (10th Cir. 2001) and Social Security Ruling (SSR) 82-41.

At the time of the ALJ's decision, Plaintiff was 45 years old, placing him in the "younger person" category according to Social Security regulations. [R. 589]. *See* 20 C.F.R. 404.1563(c) ("If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work."). However, in this case, after stating that transferability of job skills was not material to the determination of disability due to Plaintiff's age, the ALJ cited the VE's testimony regarding transferable skills as support for his step five findings. [R. 18]. Counsel for the Commissioner argues that the testimony given by the VE at the hearing as to the skills acquired and the transferability of those skills to other jobs was sufficient under the regulations and case law to support the ALJ's step five findings in this case.

16

[Defendant's brief, p. 4]. The Commissioner did not indicate whether the issue of transferable skills is actually relevant in this case.

Upon remand, the ALJ should clarify his findings in this regard and, if the issue of transferable skills is found to be material to his determination, he must make specific findings as to the particular skills Plaintiff may have acquired and the specific jobs to which those skills are transferable as well as to identify the evidence in the record that provides the basis for such findings. *See Dikeman*, 245 F.3d at 1187; 20 C.F.R. § 404.1568.

## **Credibility**

Finally, Plaintiff complains the ALJ's determination that Plaintiff's statements concerning the intensity, duration and limiting effects of his symptoms are not entirely credible is not supported by the record. Because the ALJ failed to address the medical evidence that did support Plaintiff's testimony, particularly the frequent and consistent reports of pitting edema in the lower extremities recorded by Dr. Evans and the observation of prominent edema by the examiner for the Department of Transportation, he could not dismiss Plaintiff's testimony that swelling affected his ability to ambulate. [R. 538, 556-562, 570-573, 583, 600-607]. After reconsideration of the medical evidence the ALJ's credibility findings must be revisited.

## **Conclusion**

The Court finds the ALJ did not properly consider all the medical evidence, that the ALJ's step five finding requires clarification and that the credibility determination

must be revisited.  Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 31st day of January, 2008.

*Frank H. McCarthy*

FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE